**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELLE McGOWAN, on behalf of herself and all others similarly situated, | Case No. 12-cv-05019 (BMC) |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| ELECTROLUX HOME PRODUCTS, INC., | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

Plaintiff Michelle McGowan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Electrolux Home Products, Inc. ("Electrolux").  The following allegations are based upon personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

<u>**NATURE OF THE ACTION**</u>

1.      From at least the mid-1990s, Electrolux designed, manufactured, marketed, and sold throughout the United States, including New York, millions of gas and electric dryers -for residential use having a common ball-hitch design (hereinafter referred to as the "dryers" or "ball-hitch dryers") under various brand names such as Electrolux, Kenmore, and Frigidaire having a uniform and dangerous defect ("the defect") that causes these dryers to catch on fire, fail, char clothes, and damage property, creating a substantial safety risk to consumers and the public.

2.      Electrolux has known of the defect since at least 1995, processed *thousands* of claims of fires caused by the defect, conducted an internal investigation of the defect, hired

outside engineers to investigate the defect, and at all relevant times  knew, or at least should have known, of the substantial safety risk its dryers posed to consumers and the public.

3.      Nevertheless, despite knowing of the defect and that the dryers pose a serious safety risk to consumers, for over a decade Electrolux chose to sell millions of these dangerous and defective dryers to consumers, hid its knowledge of the defect and the dryers' substantial safety risk from the public, did nothing to remove its defective and dangerous dryers from households across the country, and did nothing to warn consumers about the defect or the substantial safety risk posed by its dryers, putting consumers across the country at a serious risk of personal injury and property loss.

4.      In short, Electrolux sold dryers to consumers that it knew, or at the very least should have known, were defective and unsafe, and it concealed information about the defect from these consumers and the public in order to facilitate sales and reap significant financial benefits.

5.      As a direct and proximate result of Electrolux concealing the defect, failing to warn its customers of the defect and the safety risks posed by the dryers, and failing to remove the defective dryers from consumer's homes or otherwise remedy the defect, Plaintiff purchased one of Electrolux's defective and unsafe dryers.

6.      In March 2012, and as a result of the defect, Plaintiff's Electrolux dryer caught on fire, causing property damage and placing Plaintiff at a serious risk of injury.

7.      Class members' dryers contain the same defect that poses the same substantial risk to the safety of consumers and the public.

## PARTIES

8.      Plaintiff is a citizen of New York and resides in Staten Island, New York.

9.     Defendant Electrolux is a Delaware corporation with its principal place of business at 10200 David Taylor Dr., Charlotte, North Carolina 28262.

10.     Upon information and belief, at all times relevant, Electrolux was engaged in the business of designing, manufacturing, and distributing the dryers throughout the United States, including in this jurisdiction. Electrolux does substantial business in New York.

11.     At all times relevant hereto, Electrolux was in the business of distributing, marketing, promoting, and selling the dryers described herein.

12.     At all times relevant hereto, Electrolux designed, promoted, and marketed the dryers described herein.

13.     Defendant Electrolux engages in a continuous course of business in New York, including selling the dryers described herein in New York; distributing products, including the dryers, in New York;; and servicing its products, including the dryers, in New York.

14.     Defendant has substantial and continuing contacts with New York, expects that its products, including dryers, will be purchased in New York, and committed tortious acts in New York.

15.     All members of the proposed Class are located in New York.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as the amount in controversy exceeds $5,000,0000, exclusive of interest and costs, and at least one member of the class is a citizen of a State different from Electrolux.

17.     This Court also has jurisdiction under 28 U.S.C. § 1332(a) as Plaintiff and Defendant Electrolux are citizens of different States and the amount in controversy exceeds $75,000.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Electrolux does substantial business in District, including selling the products at issue, and Plaintiff's claims arise from damages sustained as a result of Defendant's defective design in New York and this District.

## FACTUAL ALLEGATIONS

19.     Upon information and belief, Electrolux is engaged in the business of designing, manufacturing, warranting, marketing, advertising and selling the ball-hitch Dryers labeled under a variety of brand names, including Electrolux, Kenmore, and Frigidaire.

20.     All brand names and model numbers sold prior to at least 2010 have the same uniform defect.

21.     In or around April 14, 2009, Plaintiff purchased one of the dryers designed, manufactured and sold into the stream of commerce by Electrolux under the brand name Frigidaire.

22.     Like all class members, Plaintiff purchased her dryer believing that it was properly designed, manufactured and tested and was safe to use in the home.

23.     Plaintiff used this dryer for its intended purpose of safely drying laundry in a manner reasonably foreseeable by Electrolux and did so on the evening of March 10, 2012

24.     On the evening of March 10, 2012, however, Plaintiff's dryer caught fire.

25.     Plaintiff's dryer caught fire as a direct and proximate result of the defect known to and concealed by Electrolux that is described in this Complaint.

26.     The defective dryer caused damage to Plaintiff's home and property that resulted in, among other things, damage to personal property, and costs to replace Plaintiff's property.  The

dryer was rendered unusable and had to be replaced, and it caused a serious risk to Plaintiff's safety.

27.     Many class members have suffered similar damages and the defect necessitates that the consumer replace the dryer.

28.     By the time Plaintiff purchased her dryer, and at the time the dryer caught fire in Plaintiff's home, Electrolux had known of the defect and the serious safety risk its dryers posed to the public for many years, but opted to remain silent and conceal evidence of the defect, and its knowledge of the defect, from the public and consumers who had either purchased or were considering purchasing the dryers.

29.     Like Plaintiff, class members also purchased the dryers designed, manufactured, and sold into the stream of commerce by Electrolux, and used the dryers for their intended purpose of safely drying laundry in a manner reasonably foreseeable by Electrolux.

30.     The other class members had dryers with the same dangerous defect that posed a substantial safety risk even during normal use.

31.     Electrolux knew of the defect and hid from the public the serious safety risk posed by its dryers with this defect while selling millions of defective dryers for use by consumers.

## THE DEFECT

32.     The dryers Plaintiff and class members purchased have a common defect in their design and manufacture.

33.     Specifically, the Electrolux ball-hitch dryers purchased by Plaintiff and class members are defective, and represent a significant safety hazard, because the design and manufacture causes lint to accumulate behind the drum in direct proximity to the heat source where it is neither visible to, nor accessible or serviceable by, the user.

34.     The defective design of the ball-hitch dryer causes the accumulation of lint behind the drum and in close proximity to the heat source with the first use of the dryer, and the accumulation continues each time the dryer is used to dry clothes in the manner Electrolux intended it to be used.

35.     The accumulation of lint behind the drum and in direct proximity to the heat source represents a known and unreasonable fire hazard as it is reasonably foreseeable that the dryer's heat source will ignite the accumulated lint during normal use and in the manner Electrolux intended it to be used.

36.     The dryers also contain a combustible plastic air duct directly below the drum and a combustible plastic blower housing adjacent to that air duct, both of which accumulate lint during normal use, and both of which are not visible to or serviceable by the user.

37.     Particles of lint that accumulate behind the drum, within the heater pan, and next to the heat source can ignite and travel into the drum to ignite clothing contained inside. This burning lint can also travel through the drum to the combustible plastic air duct and blower housing and ignite those combustible materials and the lint contained therein.

38.     The Electrolux ball-hitch dryers are also defective because Electrolux uses combustible plastic components in the air duct and blower housing that provide an additional fuel source for the fire.  These plastics not only catch fire but melt, and the hot molten plastic then spreads the fire inside the dryer cabinet as well as outside the dryer, where it can spread and ignite surrounding items.

39.      Indeed, although one distributor (General Electric, "GE") insisted that Electrolux use plastics having fire inhibitors in all ball-hitch dryers Electrolux manufactured for sale under the GE brand name,  Electrolux did not use plastics having fire inhibitors in all other ball-hitch

dryers it designed and manufactured, thereby unnecessarily creating an additional, serious safety risk to consumers.

40.     The defects described herein are particularly dangerous because they cannot be detected by the consumer during normal use.  This is because the defects exist in an area of the dryer not visible to the consumer.  Defendant designed the dryer so that lint accumulating behind the drum and in the heater pan, or within the combustible plastic air duct and blower housing, is not visible and could not be removed without first dismantling the dryer.

41.     Plaintiff and class members not only lack any ability to see lint accumulating behind the drum in close proximity to the heat source, or within the combustible plastic air duct and blower housing, but they are unable to remove any accumulated lint in these areas of the dryer without first dismantling the dryer.

42.     In fact, Electrolux does not provide Plaintiff or class members with any instructions as to how to remove any of the accumulated lint, nor does it provide such instructions to its authorized service representatives.

43.     The defect exists because Electrolux failed to adequately design, manufacture and test the dryers to ensure they were free from defect at the time of sale and failed to remove the dangerously defective dryers from Plaintiff's and class members' homes despite knowing of the defect and the significant risk it posed to consumers and the public.

44.     This defect, which is undetectable to the consumer, exists in the dryers when they leave Electrolux's possession and creates an immediate safety risk to consumers.

45.     For the period 2002 through 2007 alone, Electrolux customers made at least *2,341 dryer fire warranty claims* to Electrolux.  *See The Charter Oak Fire Ins. Co. a/s/o Hulis & Sahliha Mavruk v. Electrolux Home Products, Inc.*, No. 10-cv-1351 (JFB)(WDW), 2012 WL

3217565 at *6 (E.D.N.Y. July 30, 2012).  Moreover, Electrolux's own documents show that 80%

of the dryer fire claims related to lint occurred within the first 18 months of usage.

46.     This common defect causes the dryer to function improperly during the expected

useful life of the product, resulting in fires like the one Plaintiff experienced as well as failures,

repairs, and a significant risk of property damage, personal injury and death.

## CONCEALMENT OF THE DEFECT

47.     In the 1990's, Electrolux was confronted with specific evidence of the defect and

the serious safety risk that the defect posed to consumers.  For example, Electrolux documents,

and deposition testimony by Electrolux engineers, show that Electrolux discovered charred lint

in a heater pan in its test dryers as early as 1995, and one of its engineers conducted a test "in

2002-03 which proved that lint could ignite the burner tube, and ultimately ignite the load."  *See.*

*Mavruk,* 2012 WL 3217565 at *7.

48.     After 2000, this evidence of a common defect in the design and manufacture of

the Electrolux dryers, and the safety risk to the public, became undeniable.  Documents hidden

by Electrolux and uncovered for the first time in recent litigation reveal that from 2002

through2007 Electrolux received *thousands* of warranty claims for fires for these dryers; that in

2005 Electrolux's product engineer admitted to the defect during an investigation by the

Japanese government, acknowledging that lint could travel out of the back of the drum into the

heater pan in the dryers; that Electrolux commissioned an outside engineering study to examine

this serious safety problem in 2002; and that Electrolux conducted an internal investigation

regarding the defect between 2002 and 2005.  *See Mavruk,* 2012 WL 3217565 at *8.

49.     Instead of taking action to redesign the dryers to remedy the defect, remove the

defective dryers it had already sold from consumers' homes, and warn consumers and the public

of the defect and considerable safety risk, Electrolux hid evidence of the defect from the public, denied the defect existed in court filings across the country, denied any liability for claims of damage to property or personal injury that resulted from the defect, created ways to hide the statistical evidence of the rates of fires, and manufactured strategies to blame consumers for damage caused by the defect to  avoid liability.

50.     The scope of Electrolux's strategy to abuse the discovery process and withhold relevant documents has only recently come to light, as evidenced by various Federal Court decisions concluding that Electrolux's conduct was "reprehensible," deprived litigants of a full and fair opportunity to litigate the cases, and was sanctionable.  *See Mavruk*, 2012 WL 3217565 at *7, *11 ("plaintiff did not have a full and fair opportunity to litigate the *Newcomb* action" as a result of Electrolux's improper withholding of documents directly responsive to discovery requests showing Electrolux's knowledge of the defects in its dryers… "[Electrolux's] conduct in this case is reprehensible. I don't use that word very often….[C]learly [Electrolux] is stonewalling this case, refusing to give discovery, cancelling depositions at the last minute…I see any violation of your discovery obligations again, any violation of discovery obligations, I'm immediately recommending Judge Bianco enters a default judgment against [Electrolux].")(transcript hearing on Motion for Sanctions before Magistrate Judge William D. Wall); *Automobile Insurance Company of Hartford a/s/o Russell Silver v. Electrolux Home Products, Inc.*, Case no. 1:08-cv-3237 (E.D.N.Y. 2008) (Electrolux sanctioned on two separate occasions on discovery issues and Magistrate Judge Reyes ordered that if Electrolux failed to produce additional responsive documents he would recommend monetary sanctions and that judgment be entered against Electrolux)("three strikes and you are out").

9

51.     In fact, the United States District Court for the Eastern District of New York concluded that an insurer who sued Electrolux over the defective dryer "was deprived of a full and fair opportunity to litigate its claim because (1) crucial evidence supporting plaintiff's claim was not produced by defendant [Electrolux] in the *Newcomb* case even though it was responsive to plaintiff's discovery requests; (2) plaintiff did not learn of the failure to produce the information until after the *Newcomb* trial; and (3) the evidence, if it had been produced by the defendant [Electrolux] in the *Newcomb* case, could have altered the outcome of that trial." *Mavruk*, 2012 WL 3217565 at *2.   The Court further concluded that "Electrolux's victory in the *Newcomb* case may have been the product of its failure to produce crucial information that was directly responsive to plaintiff's discovery demands in that case."  *Id.*

52.     Amazingly, even after Electrolux was forced to produce documents evidencing the existence of the defect and its knowledge of the defect, (*see, e.g., Mavruk*, 2012 WL 3217565), Electrolux has continued to deny the defect exists in court proceedings.  Electrolux argued as recently as December 2011, to the United States District Court for the Eastern District of  New York that the plaintiff in that case should be *collaterally estopped* from even bringing an action on the defect in the Electrolux dryers, an argument the Court rejected due to Electrolux's numerous, documented discovery abuses.  *See Mavruk*, 2012 WL 3217565.

53.     Not only has Electrolux hidden evidence of the defect and its knowledge of the defect from the public and denied the defect exits or poses any safety risk to the public, but it conceived and executed a strategy to place safety "warnings" in its user guides that have no engineering basis and exist solely to provide a means to blame consumers in any litigation for fires or other malfunctions in its dryers that result from the defect.

54.     For example, Electrolux inserted a statement in its user guides that "Every 18 months an authorized servicer should clean the dryer cabinet interior and exhaust duct." Electrolux has been unable in prior depositions to provide any engineering basis for this statement or an explanation of why Electrolux inserted it in to the user guide.  In fact, Electrolux's own documents show that 80% of the fire warranty claims related to lint occurred within the first 18 months of use.

55.     Nonetheless, as recently as May 11, 2012, Electrolux expressly relied on this statement to argue that it had no liability for the defect and the court should dismiss plaintiff's complaint because "[p]laintiff's allegation shows, at most, that she failed to heed the warnings and instructions in her Use & Care Guide" to have the dryer serviced every 18 months. *Humphrey v. Electrolux,* 4:12-cv-00157 (E.D. Ark.) (Dkt. No. 17 at 8 n.3).  Electrolux made this argument even though it knew, or should have known, that the 18 month period has no engineering basis and is nothing more than part of its strategy to conceal the defect from consumers and avoid liability for damages caused by the defect.

56.     Electrolux had a duty to protect consumers by, at the very least, warning them that the dryers had a serious defect that posed a substantial risk to personal safety.

57.     Nonetheless, even though Electrolux had knowledge of the defect in its dryers and of the substantial safety risk posed by its dryers, Electrolux opted to conceal the defect and evidence of the defect from the public so it could realize the substantial financial benefits of selling the dryers to the public, who had no knowledge of the defect or the risk the defect posed to their personal safety.

58.     Electrolux knew, or should have known, that reasonable consumers like Plaintiff and the class members were unaware of the defects and could not discover the defects.

59.     Electrolux knew or should have known that reasonable consumers like Plaintiff and the class members expected the dryers to safely dry clothes without putting consumers' lives and property at risk and expected that the dryers were safe to use in the home.

60.     Electrolux knew or should have known that reasonable consumers expected Electrolux to disclose any defects that would prevent the dryers from performing their function before the end of their useful lives or that would seriously threaten the Class members' property and personal safety, and that such decision would impact any reasonable customer's decision as to whether to purchase the dryers.

61.     Plaintiff was unaware of the defect at the time her dryer caught fire causing severe property damage and a serious risk to personal safety.

62.     Had Electrolux disclosed the serious safety problem with its dryers, Electrolux would not have been able to sell its dryers.

63.     Electrolux's reprehensible conduct has harmed Plaintiff and class members and has left millions of consumers with a serious safety risk in their homes.

**IMMEDIATE AND CONTINUING SAFETY RISK**

64.     The Electrolux dryers purchased by Plaintiff and class members should have been usable for their intended purpose of safely drying clothes during their expected useful lives and should not have been sold containing a known safety risk to consumers.

65.     The National Association of Home Builders ("NAHB") found in a 2007 study that it conducted with Bank of America Home Equity that the useful expected life of a dryer is 13 years.

66.     The defect in the design and manufacture of Electrolux dryers has caused and will cause Plaintiff's and class members' dryers to fail or catch fire during their expected useful lives, both within and without or outside of applicable warranty periods.

67.     Moreover, the Electrolux dryers pose a substantial safety risk to consumers and the public upon purchase and continue to pose a substantial safety risk to consumers and the public during their useful lives.

68.     Thus, the defect rendered the Electrolux dryers unfit for the ordinary and intended purpose for which they were marketed and sold to Plaintiff and class members at the time of sale.

69.      Had the dryers been free from the defect, Plaintiff and the class members would not have suffered the damages complained of herein.

70.     Had Electrolux complied with its duty not to place an unsafe product into the market, to disclose the defect it knew of or should have known of to consumers and the public, or to remedy a defect it knew or should have known posed a substantial safety risk to consumers, Plaintiff and the class members would not have suffered the damages complained of herein.

## <u>CLASS ACTION ALLEGATIONS</u>

71.     Plaintiff brings this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) against Electrolux on her own behalf and on behalf of the Class as defined below.

72.     The Class consists of:

> During the fullest period allowed by law, all persons in the State of New York who purchased or otherwise acquired an Electrolux designed or manufactured ball-hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale having the defect.

73.     The Class is limited to the time period beginning on the date established by the Court's determination of any applicable statute of limitation, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

74.     Excluded from the Class are (a) any Judge or Magistrate presiding over this action and members of their families; (b) Electrolux and any entity in which Electrolux has a controlling interest or which has a controlling interest in Electrolux; (c) the officers, directors or employees of Electrolux; and (d) Electrolux's legal representatives, assigns and successors; and (e) all persons who properly execute and file a timely request for exclusion from the class or Class.

75.     Plaintiff reserves her right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

76.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

77.     Numerosity: While the exact number of members cannot be determined yet without discovery, upon information and belief the Class consists of thousands of people dispersed throughout the State of New York.  The exact number of class members can readily be determined by reviewing information maintained by Electrolux.

78.     The class members are therefore so numerous that joining all members is impracticable.

79.     Commonality:  Common questions of law and fact exist as to all class members. Among the questions of law and fact common to the Class are:

    a.      Whether the dryers designed, manufactured and sold by Electrolux contained a material design defect and posed a safety risk to consumers;

14

b.      Whether Electrolux knew the product it sold into the stream of commerce contained a material design defect and posed a serious safety risk to consumers;

c.      Whether Electrolux concealed the defect as well as the safety risk its dryers posed to consumers;

d.      Whether the defect in the dryers represent an unreasonable risk of fire;

e.      Whether the dryers are of merchantable quality;

f.      Whether the dryers are likely to pose a serious safety risk to consumers before the end of the dryers' reasonable expected lives;

g.      Whether the dryers are likely to catch  fire or fail before the end of their reasonable expected lives;

h.      Whether the dryers' defect resulted from Electrolux's negligence;

i.      Whether Electrolux breached express warranties relating to the dryers by failing to recall, replace, repair or correct the defect in the dryers;

j.      Whether Electrolux breached implied warranties of merchantability or fitness for a particular purpose relating to the dryers;

k.      Whether Electrolux either knew or should have known of the defect prior to distributing the dryers to Plaintiff and members of the Class;

l.      Whether Electrolux omitted or concealed or failed to disclose material information regarding the defect in the dryers or the dryers' safety issues;

m.      Whether Electrolux failed to warn consumers regarding the defect;

n.      Whether Electrolux failed to warn consumers about the dryers' serious safety issues;

o.     Whether Electrolux should be ordered to disgorge all or part of the profits it received from the sale of the defective dryers;

p.     Whether Plaintiff and members of the Class are entitled to damage, including compensatory, exemplary, and statutory damages, and the amount of such damages;

q.     Whether Plaintiff and members of the Class are entitled to replacement of their defective Electrolux dryers;

r.     Whether Plaintiff and members of the Class are entitled to equitable relief, including an injunction and requiring that Electrolux engage in a corrective notice campaign and a recall;

s.     Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and costs.

80.     <u>Typicality</u>:  Plaintiff has substantially the same interest in this matter as all other class members and Plaintiff's claims arise out of the same set of facts and conduct as all other class members.  Plaintiff and all class members own or owned a clothes dryer designed or manufactured by Electrolux with a uniform defect that make the dryer immediately dangerous upon purchase and that cause the dryers to fail within their expected useful lives and catch on fire.  All of the claims of Plaintiff and class members arise out of Electrolux's placement of a product it knew was defective and caused a safety risk to consumers into the marketplace and Electrolux concealing  this known safety risk and defect.  Also common to Plaintiff's and class members' claims are Electrolux's conduct in designing, manufacturing, marketing, warranting

16

and selling the defective dryers, and Electrolux's conduct in concealing the defects in the clothes dryers.

81.     Adequacy of Representation:  Plaintiff is committed to pursuing this action and has retained competent counsel experienced in products liability, deceptive trade practices, and class action litigation.  Accordingly, Plaintiff and her counsel will fairly and adequately protect the interests of the class members.  Plaintiff's claims are coincident with, and not antagonistic to, those of the other class members she seeks to represent.  Plaintiff has no disabling conflicts with the class members and will fairly and adequately represent the interests of the class members.

82.     The elements for class certification under Rule 23(b)(2) are met.  Electrolux will continue to commit the violations alleged, and the class members and the general public will continue to be at an unreasonable and serious safety risk of fire from the defective dryers. Electrolux has acted and refused to act on grounds that apply generally to the class members so that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

83.     The elements of Rule 23(b)(3) are met.  Here, the common questions of law and fact enumerated above predominate over the questions affecting only individual class members, and a class action is the superior method for fairly and efficiently adjudicating the controversy. There will be many other pending cases against Electrolux.  Serial adjudications in numerous venues are not efficient, timely or proper.  Judicial resources throughout New York and the United States will be unnecessarily depleted by resolving individual claims.  Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments have and will result in inconsistent relief for similarly situated consumers.   Plaintiff's counsel, highly experienced in class action litigation, foresee

little difficulty in managing this case as a class action. Indeed, the only way to ensure that the serious conduct alleged herein is remedied is through a class action on behalf of consumers.

## TOLLING AND ESTOPPEL OF STATUTES OF LIMITATION

84.     The claims alleged herein accrued upon discovery of the latently defective nature of the dryers and the dryer drums contained therein.  Because the defect alleged herein is hidden and because Electrolux took steps to actively conceal the true character, nature and quality of the dryers, among other reasons, Plaintiff and class members did not discover and could not have discovered the problems and defects alleged herein through reasonable and diligent investigation.

85.     Any applicable statutes of limitations have been tolled by Electrolux's knowledge and actual concealment and denial of the facts as alleged herein, a concealment which is ongoing.  Plaintiff and class members could not have reasonably discovered the true, latently defective nature of the dryers.  As a result of Electrolux actively concealing the defects,  any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

86.     Alternatively, the facts alleged above give rise to an estoppel.  Electrolux knew of the defect and the serious safety risk it posed to consumers and has actively concealed it. Electrolux was and is under a continuous duty to disclose to Plaintiff and class members the true character, quality and nature of the dryers, particularly that they posed a serious risk to public safety, fire hazard and risk of failure.  At all relevant times, and continuing to this day, Electrolux knowingly concealed the true character, quality and nature of the dryers and sold those dryers into the stream of commerce as if they were safe for use.  Given that Electrolux concealed  this non-public information about the defective nature of the dryers and safety risk to the public —information over which Electrolux had exclusive control— and because Plaintiff and class members could not reasonably have known that the dryers were thereby defective,

Plaintiff and class members reasonably relied on Electrolux's knowing concealment.  Had

Plaintiff and class members known that the dryers posed a safety risk to the public they would

not have purchased the Electrolux dryers.  Based on the foregoing, Electrolux is estopped from

prevailing on any statute of limitations defense in this action.

87.     Additionally, Electrolux is estopped from raising any defense of laches due to its

own unclean hands as alleged herein.

## CLAIMS FOR RELIEF

### COUNT I: FRAUDULENT CONCEALMENT
### (Plaintiff, Individually and on Behalf of the Class)

88.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth

herein.

89.     As set forth more fully above, at all relevant times, and since at least 1999,

Electrolux knew that the dryers it designed, manufactured and sold were defective in their design

and manufacture, would catch on fire, cause property damage or injury, or fail in advance of

their anticipated useful life under ordinary use and conditions.

90.     Also as more thoroughly set forth above, Electrolux knew that the defect posed a

serious safety risk to Plaintiff and class members, but purposefully concealed that information

from them.

91.     Electrolux concealed material information regarding the defect.

92.     Electrolux was and is under a duty to Plaintiff and class members to disclose these

facts because it had exclusive knowledge of material facts regarding the defect and the safety

risk to Plaintiff and class members, facts not known to class members.

93.     Defendant actively concealed from Plaintiff and class members the fact that the dryers were and are defective and pose a serious safety hazard at the time it placed the dryers into the stream of commerce.

94.     Defendant's concealment continues today as Electrolux has done nothing to warn consumers of the defect or the serious safety risk of its dryers and has done nothing to remove the dryers from the marketplace.

95.     Electrolux fraudulently and intentionally concealed from, or failed to disclose to, Plaintiff and class members the facts described herein with the intent to defraud Plaintiff and class members and for the purpose of inducing Plaintiff and class members to act thereon by purchasing the dryers.

96.     Electrolux knew that Plaintiff and class members would not purchase the dryers if Electrolux disclosed the defective nature of the design and manufacture of the dryers.

97.     Plaintiff and class members were unaware of the defective nature of the dryers and unaware that, because of those defects, the dryers were prone to fail, cause property damage, and posed a serious and potentially fatal fire hazard.

98.     Had Electrolux disclosed the true unsafe and defective nature of the dryers, Plaintiff and class members would not have purchased the dryers.

99.     As a direct and proximate cause of Electrolux's misconduct, Plaintiff and class members have suffered actual damages.

100.    Plaintiff and class members have also suffered unreasonable diminution in value of their dryers as a result of Electrolux's misconduct.

101.    Electrolux's acts were done deliberately and with intent to defraud the general consuming public, and in reckless disregard of Plaintiff's and class members' rights and well-

being and to enrich Electrolux.  Electrolux's misconduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be

determined according to proof.

## COUNT II: VIOLATION OF N.Y. G.B.L. § 349
### (Plaintiff Individually and on Behalf of the Class)

102.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth

herein.

103.    Plaintiff and other members of the Class are "consumers" in accordance with

N.Y. GBL § 349.

104.    At all relevant times material hereto, Electrolux conducted trade and commerce in

New York and elsewhere within the meaning of GBL § 349.

105.    Electrolux concealed the following material facts:

a.      Electrolux ball-hitch dryers are designed and sold with a defect that poses

a substantial safety hazard to the consumer.

b.      Electrolux ball-hitch dryers are defective because they are designed in

such a way that allows lint to accumulate behind the dryer's drum and

next to the heat source.  This defective design results in lint accumulating

in areas that are not visible to, or serviceable by, the user. The dryers also

contain a combustible plastic air duct directly below the drum and a

combustible plastic blower housing adjacent to that air duct, both of which

accumulate lint during normal use, and both of which are not visible to or

serviceable by the user.  Particles of lint that accumulate and ignite behind

the drum and within the heater pan can travel into  and through the drum

to ignite clothing inside the dryer drum and lint within the combustible

plastic air duct and blower housing.  These design defects create a substantial fire hazard that Electrolux conceals from its consumers.

106.    Electrolux consciously omitted to disclose material facts from Plaintiff and other class members with respect to the use and dangers associated with the dryers.

107.    Electrolux intended that Plaintiff and class members rely on Electrolux's acts of concealment and omissions, so that Plaintiff and class members would purchase or lease Electrolux dryers.

108.    The foregoing acts, omissions and practices proximately caused Plaintiff and class members to suffer actual injury, including, monies spent to replace or repair the dryers or monies spent as a result of damage to their property or person as a result of fire caused by the dryers.

## COUNT III: NEGLIGENCE
### (Plaintiff, Individually and on Behalf of the Class)

109.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

110.    Electrolux had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling and distributing dryers into the stream of commerce, including a duty to assure that the product did not cause users to suffer from unreasonable, dangerous side effects.

111.     Electrolux failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, testing, quality assurance, quality control, and distributing dryers into interstate commerce in that Electrolux knew or should have known that its dryers created a high risk of unreasonable, dangerous side effects, including possible death and injury, expense and economic loss, and that the Plaintiff and class members will suffer emotional distress associated with having potentially dangerous product in

their homes.

112.     The negligence of the Electrolux, its agents, servants, and employees, included the following acts and/or omissions:

a.     Manufacturing, producing, promoting, formulating, creating,   designing and selling dryers without thoroughly or adequately testing them;

b.     Not conducting sufficient testing programs to determine whether or not the dryers were safe for use; in that Electrolux knew or should have known that  the dryers were unsafe and unfit for use by reason of the dangers to their users;

c.     Selling defective dryers without properly and sufficiently testing them to determine the dangers to their users;

d.     Concealing the dangers of the dryers from the public and negligently failing to adequately and correctly warn the public and purchasers/users of the dryers;

e.     Failing to provide adequate instructions regarding safety precautions to be observed by purchasers/users, handlers, and persons who would reasonably and foreseeably come into contact with dryers;

f.      Negligently designing dryers in a manner which was dangerous to their users;

g.     Negligently manufacturing dryers in a manner which was dangerous to their users; and

h.     Concealing information from the Plaintiff and class members that dryers were defective, unsafe, and dangerous;

113.    Electrolux was negligent in designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and selling dryers in that it:

      a.     Failed to use due care in designing and manufacturing the dryers so as to avoid the aforementioned risks to individuals when dryers were used for their normal purpose;

      b.     Concealed the defects and failed to warn consumers of the dangers associated with the use of its dryers;

      c.     Failed to accompany their product with proper warnings regarding all possible dangers associated concerning the failure and/or malfunction of dryers;

      d.     Failed to warn Plaintiff and the class members of the severity of the dangers associated with the dryers as the warnings given did not accurately reflect the true gravity of the risks and dangers;

      e.     Failed to conduct adequate testing, including pre- and post-marketing surveillance to determine the safety of dryers;

      f.     Was otherwise careless and/or negligent.

114.    Although Electrolux knew or should have known that its dryers were unreasonably dangerous, Electrolux continued and is currently continuing to market, manufacture, distribute and sell dryers to consumers, including the Plaintiff and the class members.

115.    Electrolux knew or should have known that consumers such as the Plaintiff and class members would foreseeably suffer injury as a result of Electrolux's failure to exercise

ordinary care, as set forth above.

116.    Electrolux's negligence was the proximate cause of injuries, harm and economic loss to Plaintiff and the Class.

### COUNT IV: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### NY UCC § 2-314
### (Plaintiff, Individually and on Behalf of the Class)

117.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

118.    Electrolux is a "merchant" within the meaning of NY UCC § 2-314.

119.    The dryers are "goods" within the meaning of NY UCC § 2-314.

120.    Electrolux's implied warranty of merchantability accompanied the sale of the dryers to Plaintiff and class members.

121.    Electrolux, by implication, warranted that the dryers were fit for ordinary use.

122.    The design and frequent failure of the dryers made them defective and, thus, unfit for the ordinary purposes for which the goods are used.  The dryers are not fit for ordinary use because they can catch fire.

123.    As set forth herein, any effort by Electrolux to disclaim or otherwise limit its responsibility for the defective dryers is unconscionable under all of the circumstances, including because Electrolux knew that the dryers were unfit for normal use.  Through the conduct described herein, Electrolux has breached its implied warranty of merchantability and is liable to Plaintiff and class members.

124.    Plaintiff and class members have sustained damages as a result of Electrolux's breaches.

125.    Plaintiff and other members of the Class have provided timely notice to

25

Electrolux regarding the problems they experienced with the dryers and, notwithstanding such notice, Electrolux has failed and refused to remedy the problems.

**COUNT V: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NY UCC § 2-315**
**(Plaintiff, Individually and on Behalf of the Class)**

126.     Plaintiff re-alleges and incorporate the preceding paragraphs as if fully set forth herein.

127.     Electrolux is a "merchant" within the meaning of NY UCC § 2-315.

128.     The dryers are "goods" within the meaning of NY UCC § 2-315.

129.     The dryers owned by Plaintiff and class members were defectively designed and manufactured and posed a serious safety risk to consumers when sold.

130.     The dryers left Electrolux's facilities and control with a defect caused by defective design incorporated into the manufacture of the dryer.

131.     The defect is substantially certain to result in malfunction during the useful life of the product and did malfunction in the useful life of Plaintiff's and class members' dryers.

132.     The defect puts the consumer at a safety risk immediately upon placing the dryer in his/her home.

133.     At the time Plaintiff and class members purchased or leased the dryers they intended to use the goods for the particular purpose of safely drying clothes in a residential setting for personal, family, or household purposes.

134.     At the time of purchase of the dryers, Electrolux had reason to know of this particular purpose and this implied warranty of fitness for a particular purpose was part of the basis of the bargain between Electrolux on the one hand and Plaintiff and class members on the bargain.

135.    Plaintiff and class members relied on Electrolux's skill and judgment to design and manufacture clothes dryers suitable for this particular purpose.

136.    At the time of purchase, Electrolux had reason to know that Plaintiff and the class members relied on its skill and judgment.

137.    The dryers, however, when sold to Plaintiff and class members, and at all times thereafter, were not fit for their particular purpose of safely drying clothes.  Specifically, the dryers owned by Plaintiff and class members were defectively designed and manufactured and left Electrolux's facilities and control with a defect caused by defective design incorporated into the manufacture of the dryer and posed a serious risk to safety immediately upon purchase.

138.    Accordingly, Electrolux breached the implied warranty of fitness for a particular purpose in that the dryers are defective and not fit for their intended purpose of safely drying clothes.

139.    As fully set forth above, Electrolux knew the dryers posed a safety risk and were defective and knew of these breaches of implied warranties prior to selling the dryers to Plaintiff and the class members.

140.    As a result of Electrolux's breach of its implied warranty of fitness for a particular purpose, Plaintiff and the class members have been damaged in an amount to be proven at trial.

### COUNT VI: STRICT PRODUCT LIABILITY
### (Plaintiff, Individually and on Behalf of the Class)

141.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

142.    At all times herein mentioned, Electrolux designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the dryers as hereinabove described and the Plaintiff and class members used said product.

143.    Electrolux expected that the dryers would reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Electrolux.

144.    At those times, the dryers were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, to Plaintiff and the class members.

145.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of the manufacturer or suppliers, the foreseeable risks exceeded the benefits associated with their design.

146.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of Electrolux or suppliers, they were unreasonably dangerous and they were more dangerous than an ordinary consumer would expect.

147.    At all times herein mentioned, the dryers were in a defective and unsafe condition, and Electrolux knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by Electrolux.

148.    Electrolux knew or should have known that at all times herein mentioned, its dryers were in a defective, inherently dangerous and unsafe condition.

149.    At the time of the Plaintiff's and class members' use of dryers, the dryers were being used for the purposes and in a manner normally intended.

150.    Electrolux, with this knowledge, voluntarily designed its dryers in a dangerous condition for use by the public, and in particular by Plaintiff and the class members.

151.    Electrolux had a duty to create products that were not unreasonably dangerous for

their normal, intended use.

152.    Electrolux created products unreasonably dangerous for their normal, intended use.

153.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were manufactured defectively in that said dryers left the hands of Electrolux in a defective condition and were unreasonably dangerous to their intended users.

154.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux reached their intended users in the same defective and unreasonably dangerous condition in which Electrolux manufactured them.

155.    Electrolux designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed defective products that created an unreasonable risk to the health of consumers and to the Plaintiff and class members in particular, and Electrolux is therefore strictly liable for the injuries sustained by Plaintiff and class members.

156.    Plaintiff and the class members could not, by the exercise of reasonable care, have discovered the defects and perceived their danger.

157.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective because Electrolux knew but concealed the unreasonable, dangerous safety hazards associated with its dryers, including possible injury and death, expense and economic loss, and Electrolux failed to adequately warn of said risks.

158.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective due to inadequate warnings and

inadequate testing.

159.    Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective due to inadequate post-marketing surveillance and warnings because, after Electrolux knew or should have known of the risks of unreasonable, dangerous safety hazards, including possible injury and death, expense and economic loss, Electrolux concealed those risks and dangers from consumers and failed to warn consumers of those risks and dangers.

160.    By reason of the foregoing, Electrolux is strictly liable to Plaintiff and the class members for manufacturing, marketing, promoting, distributing, and selling defective dryers.

161.    Electrolux's defective design, manufacturing defect, and inadequate warnings of dryers were acts that amount to willful, wanton, and reckless conduct by Electrolux.

162.    The defects in Electrolux's dryers were a substantial factor in causing injuries to the Plaintiff and class members.

163.    As a result of the foregoing acts and omissions, Plaintiff and the class members were and/or still are caused to suffer unreasonable, dangerous effects, including  possible injury and death, expense and economic loss.

**COUNT VII: INJUNCTIVE RELIEF**
**(Plaintiff Individually and on Behalf of the Class)**

164.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

165.    Electrolux designed, manufactured, produced, tested, inspected, marketed, distributed, and sold dryers containing material and dangerous defects as described herein.

166.    Based upon information and belief, Electrolux continues to market, distribute, and sell dryers containing material and dangerous defects and has done nothing to remove the dryers

containing the defects described herein from the market and from the households of consumers.

167.    The defects described herein are an imminent threat to the safety of the Plaintiff and class members.

168.    Based upon information and belief, Electrolux has taken no corrective action concerning the defects described herein, and has not issued any warnings or notices concerning the dangerous defect, nor implemented a product recall.

169.    Plaintiff and the class members have suffered actual damage or injury or are in immediate risk of suffering actual damage or injury due to the dryers' defects.  Electrolux should be required to take corrective action to prevent further injuries, including:

a.    Issuing a State-wide recall of the defective dryers;

b.    Issuing warnings or notices to consumer and the Class members concerning the dryer defects; and

c.    Immediately discontinuing manufacturing, producing, marketing, distributing, and selling the defective dryers described herein.

## COUNT VIII: DECLARATORY RELIEF
### (Plaintiff Individually and on Behalf of the Class)

170.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

171.    There is an actual controversy between Electrolux and class members concerning the existence of defects in the dryers.

172.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

173.    Accordingly, Plaintiff and the class members seek a declaration that the dryers

have a common defect in their design and manufacture that will cause the dryer to function improperly during the expected useful life of the product.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following judgment:

A.      An Order certifying this action as a class action;

B.      An Order appointing Plaintiff as the class representative and appointing counsel undersigned to represent the Class;

C.      A Declaration that the dryers are defective;

D.      An Order awarding injunctive relief by requiring Electrolux to issue corrective actions including notification, recall, inspection and, as necessary, repair and replacement of the dryers;

E.      Payment to the Class of all damages associated with the defective products, in an amount to be proven at trial;

F.      An award of attorneys' fees and costs, as provided by law or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class;

G.      Interest as provided by law, including pre-judgment and post-judgment interest as provided by rule or statute;

H.      Punitive damages as allowed by law and the proof presented in this case; and

I.      Such other and further relief as this Court may deem just, equitable, or proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  December 4, 2012


By:  /s/ Stephen J. Fearon, Jr.
        Stephen J. Fearon, Jr.
        Caitlin Duffy
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, New York 10022
Tel.: (212) 421-6492
Fax: (212) 421-6553
Email: Stephen@sfclasslaw.com
Email: caitlin@sfclasslaw.com

**GREG COLEMAN LAW PC**
GREGORY F. COLEMAN
MARK E. SILVEY
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, Tennessee 37902
Telephone: (865) 247-0080
Facsimile: (865) 522-0049

**WEXLER  WALLACE LLP**
EDWARD A. WALLACE
AMY E. KELLER
DAWN M. GOULET
eaw@wexlerwallace.com
aek@wexlerwallace.com
dmg@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**HANSEN RIEDERER DICKINSON
CRUEGER & REYNOLDS LLC**

CHARLES CRUEGER
ERIN DICKINSON
charles@hrdc-law.com
erin@hrdc-law.com
316 North Milwaukee Street, Suite 200
Milwaukee, Wisconsin 53202
Telephone: (414) 455-7676
Facsimile: (414) 273-8476

*Attorneys for the Plaintiff and Putative Class*

## CERTIFICATE OF SERVICE

I, Stephen J. Fearon, Jr., hereby certify that on this 4th day of December, 2012  I caused a

copy of the accompanying Second Amended Complaint to be served upon the persons/entities

listed below by electronic means through the Court's CM/ECF service:

> James K. Leader
> Thomas Key Richards
> Leader & Berkon LLP
> 630 Third Ave
> New York, NY 10017
> Email: jkleader@leaderberkon.com
> Email: trichards@leaderberkon.com
>
>
> Jessica G. Scott
> Michael T. Williams
> Wheeler Trigg O'Donnell LLP
> 370 Seventeenth Street
> Ste 4500
> Denver, CO 80202
> Email: scott@wtotrial.com
> Email: Williams@wtotrial.com
>
>
> *Attorneys for Defendants*

/s/ Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr.